# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 2 C 674 | **DATE** | 6/11/2002 |
| **CASE TITLE** | | Global Relief vs. O'Neill | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons we deny [8-1] the motion of Global Relief Foundation, Inc. for injunctive relief.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. *handed out by judges' staff* | | JUN 11 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | 52 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| TSA | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GLOBAL RELIEF FOUNDATION, INC., | ) | |
| | ) | **DOCKETED** |
| Plaintiff. | ) | Case No. 02 C 674 |
| | ) | JUN 1 1 2002 |
| v. | ) | |
| | ) | Wayne R. Andersen |
| PAUL H. O'NEILL, COLIN L. POWELL, | ) | District Judge |
| JOHN ASHCROFT, R. RICHARD | ) | |
| NEWCOMB, and ROBERT S. MUELLER, III, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the motion of plaintiff Global Relief Foundation, Inc. for preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65. For the following reasons, the motion is denied.

### OVERVIEW

Before addressing the motion for preliminary injunction filed by the plaintiff, Global Relief Foundation ("Global Relief"), a brief description of this case is in order.

On December 14, 2001, the Federal Bureau of Investigation ("FBI") searched the headquarters of Global Relief and the home of its executive director. Pursuant to the searches, materials were seized for analysis by the FBI. Global Relief contends that both the search and seizure were unauthorized by law and unconstitutional. The defendants maintain that both the search and seizure were lawfully authorized by the Foreign Intelligence Surveillance Act and that they were constitutional. This Court agrees with the defendants.

w<sup>a.</sup> 52

Also on December 14, 2001, the Office of Foreign Asset Control ("OFAC") of the United States Department of the Treasury issued a blocking order freezing the financial assets of Global Relief pending the FBI's investigation of what relationship, if any, Global Relief might have to the terrorists behind the September 11, 2001 attacks on the World Trade Center and the Pentagon. Global Relief contends that the order temporarily "freezing" its assets was not authorized by statute, executive order or the Constitution. The defendants maintain that this blocking order was both lawful and constitutional. They cite the International Emergency Economic Powers Act, as amended by the USA Patriot Act, as the statutory basis for the authority to issue the blocking order. This authority was granted first to the President and then delegated by him to the Treasury pursuant to Executive Order Number 13224. Once again, this Court agrees with the defendants.

The assets seized for analysis and the funds blocked by OFAC's order have been seized and blocked "pending investigation" of Global Relief and others. Thus far, no agency of the United States government has declared or requested any forfeiture of assets to the government. Nor have any individuals or Global Relief been charged with any crimes. Hence, Global Relief's request for a preliminary injunction is directed only to the release of funds and materials seized for investigative purposes while the investigation itself is ongoing.

To justify its emergency search and, to some extent, the blocking order, defendants have asked this Court to review materials, *in camera* and *ex parte*, without revealing them to Global Relief or its attorneys. In accordance with our order of April 5, 2002, we have reviewed materials furnished by the FBI to us and have concluded that they are relevant to the ongoing investigation and that their disclosure to Global Relief, while the investigation is pending, could undermine this investigation and others of national significance.

2

# BACKGROUND

Global Relief began operating in 1992 as a domestic, non-profit corporation chartered and headquartered in Illinois. According to its complaint, Global Relief claims to be a charitable organization that funds humanitarian relief programs throughout the world. These programs allegedly distribute food, fund schools for orphans, and provide medical services.

Global Relief characterizes itself as the largest U.S.-based Islamic charitable organization "with respect to the geographic scope of its relief programs." (Complaint ¶ 12.) As contributions to Global Relief increased (in 1995, the organization reported accepting donations totaling $431,155; by 2000, it reported nearly $3.7 million), it appears to have expanded the reach of its efforts. In 1995, it reported funding programs in Chechnya, Bosnia, Pakistan, Kashmir, and Lebanon. It reported funding additional programs in Afghanistan and Azerbaijan in 1996, Bangladesh in 1997, Iraq and Somalia in 1998, Albania, Belgium, China, Eritrea, Kosovo, and Turkey in 1999, and, eventually, Ethiopia, Jordan, Palestine, and Sierra Leone in 2000. Global Relief also has funded programs in Gaza and the West Bank. (Complaint ¶ 11.) To assist with the distribution of humanitarian aid abroad, Global Relief established regional offices in Belgium, Azerbaijan, and Pakistan. Reportedly, such offices received hundreds of thousands of dollars in contributions, in addition to the amounts reported by the headquarters in the United States. Although Global Relief has funded relief programs in the United States, over 90 percent of its donations have been sent abroad.

On September 11, 2001, terrorists attacked the United States. Individuals hijacked four commercial airliners containing passengers and crew and flew them deliberately into the two towers of the World Trade Center in New York City as well as into the Pentagon near Washington, D.C.

3

The fourth plane was diverted from its path and crashed in rural Pennsylvania. Over 3,000 people were murdered.

On September 24, 2001, President George W. Bush declared a national emergency with respect to the "grave acts of terrorism and threats of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." Exec. Order No. 13224, 66 Fed. Reg. 49074 (2001). The President determined that the acts perpetrated on September 11 constituted "an unusual and extraordinary threat to national security, foreign policy, and economy of the United States." In light of the "pervasiveness and expansiveness of the financial foundation of terrorists," the President cited the need for financial sanctions against individuals or organizations that engage in or support terrorism throughout the world.

On December 14, 2001, pursuant to the Foreign Intelligence Surveillance Act, then-acting Deputy Attorney General Larry D. Thompson authorized the search of Global Relief's Bridgeview, Illinois office and the residence of its executive director. The FBI's Chicago Division Joint Terrorism Task Force conducted both searches. From the Global Relief office, the FBI seized items including computers and servers, modems, a cellular phone, hand-held radios, video and audio tapes, cassette tapes, computer diskettes, a credit card imprinter, foreign currency, U.S. mail, photographs, receipts, documents, and records. From the executive director's residence, the FBI seized computers, computer diskettes, video and audio tapes, cassette tapes, date books, a cellular telephone, a camera, a palm pilot, credit cards, foreign currency, photographs, documents, records, and $13,030 in U.S. currency. Since being seized, the items removed from both the Global Relief office and the executive director's residence have been secured in FBI custody for review and analysis.

Also, on December 14, 2001, pursuant to the International Emergency Economic Powers Act and President Bush's Executive Order, OFAC issued a "Blocking Notice and Requirement to Furnish Information" to Global Relief, which "froze," until further notice, the funds, accounts, and business records in which the organization had an interest. OFAC has claimed that it acted on the basis of substantial classified and unclassified information related to Global Relief's possible connections with terrorist organizations.

The blocking order advised Global Relief of the administrative procedures available to it should it choose to contest OFAC's action, including the right to challenge the blocking and to seek licenses to resume operations in whole or in part. Although Global Relief applied for and was granted licenses to access limited blocked funds to pay for legal expenses, salaries, payroll taxes, health insurance, rent, and utilities, it did not challenge the blocking order itself through administrative procedures.

On January 28, 2002, Global Relief filed a petition for declaratory judgment and injunctive relief and for a writ of mandamus with this Court, naming Paul H. O'Neill, Colin L. Powell, John Ashcroft, R. Richard Newcomb, and Robert S. Mueller, III, in their official capacities, as defendants (collectively, the "defendants"). In its petition, Global Relief requested that the defendants be ordered to "unfreeze" its assets and return the items seized during the search of the organization's office and the executive director's residence. In addition, on February 12, 2002, Global Relief filed a motion for preliminary injunction, arguing that the blocking of its assets and records was both unlawful and unconstitutional.

# DISCUSSION

In its motion, Global Relief has requested a preliminary injunction from this Court that

would serve to enjoin the defendants from: 1) blocking or otherwise controlling Global Relief's

property; 2) barring Global Relief from doing business; 3) withholding Global Relief's records;

4) "smearing" its name; and 5) punishing Global Relief's donors for making donations to the

corporation. (Global Relief Prelim. Injunction Brief at 2.) In this circuit, to obtain a preliminary

injunction, Global Relief must show: 1) a reasonable likelihood of success on the merits; 2) the

existence of an irreparable harm without the injunction; and 3) an inadequate remedy at law.

*Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474-75 (7th Cir. 2001); *Re/Max North*

*Central, Inc. v. Cook*, 272 F.3d 424, 429 (7th Cir. 2001); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d

891, 895 (7th Cir. 2001). If Global Relief satisfies this initial burden, then the Court must

balance the irreparable harm to the non-moving party if the injunction is granted against the

irreparable harm to the moving party if the injunction is denied. *See Graham v. Medical Mutual*

*of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *Grossbaum v. Indianapolis-Marion County Bldg.*

*Auth.*, 100 F.3d 1287, 1291 (7th Cir. 1996), *cert. denied*, 520 U.S. 1230 (1997); *Publications*

*Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996). The Court must also consider the

public interest in denying or granting the injunction. *See Ty, Inc.*, 237 F.3d at 895.

In addition to these traditional preliminary injunction requirements, Global Relief faces

additional burdens. Because Global Relief is requesting that this Court order the defendants to

perform certain acts (i.e. "unfreeze" its assets and return the collected documents), it is

essentially seeking a mandatory preliminary injunction. As the Seventh Circuit has previously

held, since a "mandatory injunction requires the court to command the defendant to take a

particular action, 'mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued.'" *Graham*, 130 F.3d at 295 (citing *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978). *See also W.A. Mack, Inc. v. General Motors Co.*, 260 F.2d 886, 890 (7th Cir. 1958) (finding that "mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds"). The burden is on Global Relief to establish that this extraordinary relief is justified.

Furthermore, by seeking injunctive relief against the decision to block its assets pending a federal investigation, Global Relief is in essence challenging the power of the Executive Branch of the United States government to conduct foreign policy. In so doing, Global Relief is asking this Court to approach the outer limit of its constitutional authority. Chief Justice Rehnquist, writing for the Court in *Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026 (1984), *reh'g denied*, 469 U.S. 912 (1984), quoted from *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512 (1952), which stated that "[m]atters related 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" As a general principle, therefore, this Court should avoid impairment of decisions made by the Congress or the President in matters involving foreign affairs or national security. *See Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention"); *Palestine Info. Office v. Shultz*, 674 F. Supp. 910, 918 (D.D.C. 1987), *aff'd*, 853 F.2d 932 (1988) (same). Accordingly, we conclude that, in order to succeed on its complaint for injunctive relief, Global Relief must make an "*exceptionally strong showing* on the relevant [preliminary injunction] factors." *Palestine Info. Office*, 674 F. Supp. at 918 (citing

*Washington Metro. Area Transit Auth. v. Holiday Tours, Inc.*, 559 F.2d 841, 956 (D.C. Cir. 1977)) (emphasis in original).

With these considerations in mind, we will now turn to the merits of Global Relief's motion for a preliminary injunction. At its core, Global Relief's motion raises two primary arguments. First, Global Relief contends that the blocking of its assets and the "seizure" of its records and documents pending an ongoing investigation by the FBI and OFAC were acts outside the powers granted to those agencies by congressional statutes. Second, Global Relief argues that both the blocking of its assets and the search of the headquarters and the executive director's home violated numerous constitutional principles. We will address each of these arguments in turn.

## I.     Likelihood of Success on the Merits

The threshold factor for a preliminary injunction is the likelihood of success on the merits, *see Rust Env't & Infrastructure v. Teunissen*, 131 F.3d 1210, 1213 (7th Cir. 1997), so we will proceed to analyze Global Relief's claims to determine whether they are likely to succeed.

### A.     Global Relief Has Not Shown A Likelihood Of Success On The Merits Of Its Statutory Arguments

#### 1.     The Foreign Intelligence Surveillance Act

As the first part of its statutory argument offered in support of its motion for a preliminary injunction, Global Relief contends that the search of its headquarters and the subsequent search of the home of Global Relief's executive director was an *ultra vires* action (which is defined as an act which is beyond the powers conferred on executive agencies by Congress). In response to this argument, the defendants have asserted that the searches conducted on December 14, 2001

were in accordance with the procedures identified in the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, (hereinafter "FISA").

FISA was passed by Congress in 1978 to "put to rest a troubling constitutional issue" regarding the President's "inherent power to conduct warrantless electronic surveillance in order to gather foreign intelligence in the interests of national security." *U.S. v. Squillacote*, 221 F.3d 542, 552 (4th Cir. 2000) (citing *ACLU Found. of S. California v. Barr*, 952 F.2d 457, 460 (D.C. Cir. 1991)). FISA was enacted to create by statute a "secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this Nation's commitment to privacy and individual rights." S. Rep. No. 95-604, at 15 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3916.

To oversee the exercise of the powers granted by FISA to the Executive Branch and to ensure that the new investigatory power is used constitutionally and lawfully, FISA established the Foreign Intelligence Surveillance Court, which is composed of seven federal district court judges appointed by the Chief Justice of the United States, to review applications for authorization of electronic surveillance aimed at obtaining intelligence information. *See* 50 U.S.C. § 1803. In 1994, FISA was amended to give the Foreign Intelligence Surveillance Court jurisdiction to hear applications for physical searches as well as electronic searches. *See* 50 U.S.C. § 1821-29. Each application to the Foreign Intelligence Surveillance Court must first be personally approved by the Attorney General. *See* 50 U.S.C. § 1804(a). The application must contain, among other things, a statement of facts to justify the belief that the target of the search is a foreign power or an agent of a foreign power, that the premises or property to be searched contains foreign intelligence information, and that the premises or property to be searched is

owned, used, or possessed by a foreign power or an agent of a foreign power. Additionally, the application must contain a certification by a senior Executive Branch official that the information sought is foreign intelligence information which could not reasonably be obtained by normal investigative techniques. *See* 50 U.S.C. § 1823(a).

When the target of the surveillance is a "United States person" (which the parties concede Global Relief is), the Foreign Intelligence Surveillance Court may issue an order authorizing the surveillance only if a FISA judge concludes there is "probable cause" to believe that the target of the surveillance is a foreign power or agent of a foreign power, that proposed "minimization procedures" are sufficient under the terms of the statute, that the certifications required by section 1823 have been made, and that the certifications are not "clearly erroneous." 50 U.S.C. § 1824(a)(3) - (5). Under the statute, an agent of a foreign power is any person "who knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States." 50 U.S.C. § 1801(b)(2)(A). FISA authorizes the federal district courts to review warrant applications and probable cause determinations made by the Foreign Intelligence Surveillance Court. *See* 50 U.S.C. § 1825(d) - (g).

Furthermore, FISA provides that, when the United States intends to use in a district court information derived from a FISA search or when an aggrieved party requests discovery of information related to a FISA application, the Attorney General must file "an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States." 50 U.S.C. § 1825(g). Attorney General John Ashcroft has filed such an affidavit in this case. This having been done, the statute requires us to "review *in camera* and *ex parte* the application,

order, and such other materials relating to the physical search as may be necessary to determine whether the physical search of the aggrieved party was lawfully authorized and conducted." *Id.* As we noted in our April 5, 2002 ruling denying Global Relief's motion to prevent consideration of certain materials *in camera* and *ex parte, see Global Relief Foundation, Inc. v. O'Neill*, No. 02C674, slip op. at 5 (N.D. Ill. April 5, 2002), this Court decided to consider these submissions. We have done so on an *ex parte* basis and have not permitted counsel for Global Relief to review the submissions with us.

With this analytical framework in mind, we now turn to the facts of the case currently before us. As was discussed above, agents of the FBI arrived at the corporate headquarters of Global Relief and the home of its executive director on December 14, 2001 and seized a considerable amount of material they felt was relevant to their investigation of Global Relief's activities. As the defendants have conceded in their briefs, no warrant had been obtained before the FBI arrived either at Global Relief's headquarters or the executive director's residence. Nevertheless, FISA includes a provision which states that, when the Attorney General declares that "an emergency situation exists with respect to the execution of a search to obtain foreign intelligence information" prior to the Foreign Intelligence Surveillance Court acting on the application, a warrantless search is authorized. 50 U.S.C. § 1824(e)(1)(B)(i). When such an emergency situation arises, the government must submit a warrant application to the Foreign Intelligence Surveillance Court within 72 hours of the warrantless search for approval. *See* 50 U.S.C. § 1824(e), *as amended by*, P.L. 107-108, 115 Stat. 1394, 1402 (2001). In this case, the failure of the FBI agents to present a FISA warrant on December 14 was caused by the Assistant Attorney General's declaration that an emergency situation existed with respect to the targeted

documents and material. The defendants did submit a warrant application to the Foreign Intelligence Surveillance Court on December 15, as required by 50 U.S.C. § 1824(e). We have reviewed the warrant that issued and the submissions to the Foreign Intelligence Surveillance Court in support of that warrant.

We conclude that the FISA application established probable cause to believe that Global Relief and the executive director were agents of a foreign power, as that term is defined for FISA purposes, at the time the search was conducted and the application was granted. We are also satisfied that Global Relief and the executive director were not targeted because of any protected First Amendment activities in which they may have engaged. Given the sensitive nature of the information upon which we have relied in making this determination and the Attorney General's sworn assertion that disclosure of the underlying information would harm national security, it would be improper for us to elaborate further on this subject. *See Squillacote*, 221 F.3d at 554 (finding probable cause to authorize FISA surveillance and declining to comment further on the probable cause issue when the Attorney General filed an affidavit); *United States v. Isa*, 923 F.2d 1300, 1304 (8th Cir. 1991) (same).

This Court has concluded that disclosure of the information we have reviewed could substantially undermine ongoing investigations required to apprehend the conspirators behind the September 11 murders and undermine the ability of law enforcement agencies to reduce the possibility of terrorist crimes in the future. Furthermore, this Court is persuaded that the search and seizure made by the FBI on December 14 were authorized by FISA. Accordingly, we decline plaintiff's request that we declare the search invalid and order the immediate return of all items seized.

## 2. The International Emergency Economic Powers Act

Global Relief also asserts that the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, (hereinafter "IEEPA") does not authorize OFAC's blocking order freezing its assets. Specifically, Global Relief raises the following three arguments: 1) IEEPA did not grant the authority to block purely domestic assets "during the pendency of an investigation;" 2) the blocking order in this case directly violated IEEPA's humanitarian relief exception; and 3) the President never legally delegated the authority to OFAC to block the assets of an organization "during the pendency of an investigation." Additionally, we note that Global Relief raised for the first time in its reply brief the argument that 18 U.S.C. § 2339B, and not IEEPA, is the proper statutory mechanism "to prevent [persons] subject to the jurisdiction of the U.S. courts from supporting designated foreign terrorist organizations." (Global Relief Reply Brief at 12.) Because the defendants have not cited this particular statutory provision in their briefs to justify OFAC's blocking order, we will not address it. *Cf. Marie O. v. Edgar*, 131 F.3d 610, 614 n.7 (7th Cir. 1997) (it is generally not appropriate to consider new arguments raised for the first time in a reply brief); *United States v. Magana*, 118 F.3d 1173, 1198 n.15 (7th Cir. 1997) (same); *Kastel v. Winnetka Bd. of Educ.*, 946 F. Supp. 1329, 1335 (N.D. Ill. 1996).

### i) Statutory and Regulatory Background

For most of this country's history, the United States government has utilized economic sanctions as a tool of its foreign policy. For most of the 20th Century, government imposed sanctions were controlled by the Trading with the Enemy Act (hereinafter the "TWEA"), which was enacted in 1917. As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared

national emergencies. *See* 50 U.S.C. app. § 5(b); *Dames & Moore v. Regan*, 453 U.S. 654, 672, 101 S.Ct. 2972 (1981).

In 1977, Congress enacted IEEPA and amended TWEA to govern "the President's authority to regulate international economic transactions during wars or national emergencies." S. Rep. No. 95-466, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA provides that the economic powers granted the President "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a); *Regan v. Wald*, 468 U.S. 222, 228, 104 S.Ct. 3026 (1984). As with TWEA, IEEPA authorized the President to:

> investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B). As originally enacted, this language was identical to the grant of power to the President under the parallel provision of TWEA.

In response to the September 11 terrorist attacks, Congress in October 2001 enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub L. 107-56, 115 Stat. 272 (the "USA Patriot Act"), which, *inter alia*, expanded the authority of the President and his designees under IEEPA. Specifically, section 106 of the new act added the words "block during the pendency of an investigation" after the word "investigate" in the above-quoted section of IEEPA's section 1702(a)(1)(B). The USA

Patriot Act also provided that, in case of judicial review of an IEEPA blocking order, any

classified information upon which the blocking determination was made "may be submitted to

the reviewing court ex parte and in camera." 50 U.S.C. § 1702(c) *as added by* 115 Stat. at 278.

Shortly after the September 11 attacks but before the enactment of the USA Patriot Act,

President Bush issued Executive Order 13224, effective on September 24, 2001, declaring a

national emergency with respect to the "grave acts of terrorism . . . and the continuing and

immediate threat of further attacks on United States nationals or the United States." Exec. Order

No. 13,224, 66 Fed. Reg. 49,079 (2001). In determining that actual and threatened terrorist acts

constituted "an unusual and extraordinary threat to the national security, foreign policy, and

economy of the United States," the President invoked the powers granted by, *inter alia*, IEEPA.

*Id.* The Executive Order designated 27 terrorists, terrorist organizations, and their supporters,

and blocked their property and property interests that have been in the United States, that

subsequently will come within the United States, or that come within the "possession or control"

of U.S. persons. *Id.*

In addition, the Executive Order authorized the Secretary of State, in consultation with

the Secretary of the Treasury and the Attorney General, to designate as subject to the provisions

of the order any "foreign persons" whom he determines "have committed or . . . pose a

significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the

national security, foreign policy, or economy of the United States." *Id.* The order also

authorized the Secretary of the Treasury, in consultation with the Secretary of State and the

Attorney General, to designate "persons" (defined in the order as individuals or entities) whose

property or interests in property should be blocked because they "act for or on behalf of" or are

"owned or controlled by" designated terrorists, or they "assist in, sponsor, or provide . . . support for," or are "otherwise associated" with them. *Id.* Finally, for purposes of this opinion, the Executive Order also granted the Secretary of the Treasury the power "to employ all powers granted to the President by IEEPA . . ." *Id.* The President authorized the Secretary of the Treasury to promulgate rules and regulations to carry out the purposes of the order and to re-delegate such functions if he so chose. *Id.*

Pursuant to a delegation of authority from the Secretary of the Treasury, OFAC has promulgated general regulations governing the various sanctions programs. *See* 31 C.F.R. pt. 500; *see also Wald*, 468 U.S. at 226 n.2. These regulations permit a designated individual or entity, or one whose assets have been blocked, to seek a license from OFAC to engage in any transaction involving blocked property. *See* 31 C.F.R. §§ 501.801-.802. In addition, the regulations establish a procedure to allow a person to "seek administrative reconsideration" of a designation if a party believes an error has been made. *See* 31 C.F.R. § 501.807.

Believing that Global Relief "may be engaged in activities that violate" the Executive Order and IEEPA, on December 14, 2001, the Secretary of the Treasury issued a notice temporarily blocking Global Relief's accounts and business records pending further investigation. The notice informed Global Relief of its right to submit evidence to challenge the blocking and/or request agency licenses. The record indicates that Global Relief has filed numerous applications for licenses since December 14, most of which have been approved by OFAC.

In situations such as this when a plaintiff is challenging an agency's interpretation of its own regulations, we note that such an interpretation must be given "controlling weight unless it

16

is plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913 (1993); *see also Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999); *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994); *D.C. Precision, Inc. v. U. S. Government*, 73 F. Supp. 2d 338, 344 (S.D.N.Y. 1999). This is especially true in matters which involve foreign policy and national security considerations. In these cases, we are "particularly obliged to defer to the discretion of executive agencies interpreting their governing law and regulations." *Paradissiotis*, 171 F.3d at 988 (citing *Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766 (1981) and *Miranda v. Secretary of Treasury*, 766 F.2d 1, 3-4 (1st Cir. 1985)). With this in mind, we now turn to the substance of Global Relief's statutory contentions.

   ii)  Does IEEPA grant the defendants the power to block domestic assets?

   Global Relief argues that IEEPA does not allow the government to block or freeze the purely domestic assets of a U.S. person (which for purposes of the statute includes a charitable entity incorporated in the U.S.). Instead, Global Relief asserts that IEEPA only authorizes the President to regulate property in which foreign persons have an interest. (Global Relief Prelim. Injunction Brief at 7.) Because Global Relief is a U.S. person and its property is exclusively domestic, plaintiff reasons that OFAC did not have authority under IEEPA to block its assets pending investigation. We disagree with this limited reading of IEEPA and its implementing regulations.

   As modified by the USA Patriot Act, section 1702(a)(1)(B) of IEEPA explicitly states that the President may "block during the pendency of an investigation . . . any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of . . .

any right, power, or privilege with respect to . . . any property in which any foreign country or a national thereof has *any* interest by any person . . . subject to the jurisdiction of the United States." (Emphasis added). Congress' decision to use repeatedly the word "any" in this section of the statute guides our interpretation of the President's power to block during the pendency of an investigation. It is clear that Congress intended to provide the President with sweeping power to regulate all relevant property upon his declaration of a national emergency. Furthermore, if Congress had intended to only authorize the President to block foreign assets that were located within the United States, it could have made that intention clear. However, repeated use by Congress of the word "any" as well as its choice of the phrase "any property, subject to the jurisdiction of the United States," without an indication that it meant only foreign property, compels our conclusion that the powers granted to the President under IEEPA include the ability to block purely domestic assets of a U.S. person pending an investigation.

Having said this, however, we must turn our attention to what constitutes an "interest" in property for purposes of IEEPA. In the regulations promulgated by OFAC with respect to IEEPA, "interest" is defined as "an interest of any nature whatsoever, direct or indirect" which can include "any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent." 31 C.F.R. §§ 535.311-.312, 595.310. Considering the high level of deference we are required to give an agency's interpretation of its own regulations, *see Stinson*, 508 U.S. at 45, *supra*, we agree with the other courts that have interpreted IEEPA and its regulations that the term "any interest" must be construed in the broadest possible sense. *See Wald*, 468 U.S. at 224, 225-26, 233-34 (repeatedly stating that the phrase "any interest" is to be broadly defined); *Consarc Corp.*, 27 F.3d at 701-02 (same).

Therefore, we conclude that the plain language of IEEPA does not limit the ability to block the domestic assets of a U.S. corporation during the pendency of an investigation when there is evidence that a foreign country or a national thereof has any interest in those assets.

With respect to the facts of this case, both parties agree that Global Relief is a United States citizen. However, the parties vigorously dispute to what extent any foreign national has had an interest in Global Relief and what the statutory consequences of that interest are. Global Relief claims that the nationality of its directors is irrelevant since the organization itself was incorporated in the United States. The defendants, however, argue that IEEPA sanctions their decision to block all of Global Relief's assets pending an investigation because Global Relief is "operated and controlled by foreign nationals, [uses] numerous foreign offices, and it raises the overwhelming majority of its money for the very purpose of sending it overseas to foreign countries and nationals." (Defendants Brief in Opp. at 24.)

As even Global Relief has conceded, at least two of the three directors of Global Relief were, at all relevant times, foreign nationals. The organization's executive director and Rabih Haddad are both foreign citizens who have resided legally in the United States for many years. While Global Relief has attempted to downplay this foreign connection in its briefs, we conclude that both the executive director and Haddad are "foreign nationals," as that term is used in IEEPA. Furthermore, there can be no dispute that both of these individuals had a direct "interest" in the solicitation and distribution of Global Relief's assets and that Global Relief's executive director was instrumental in deciding which overseas entities and individuals were to receive Global Relief's contributions. In light of these facts, we are compelled to conclude that the defendants were authorized to block the assets of Global Relief pending an investigation

pursuant to IEEPA because certain foreign nationals, including the executive director, had, at all relevant times, an "interest" in the operation of Global Relief. Therefore, we find that the blocking order issued by OFAC on December 14, 2001 was not an *ultra vires* act, but rather was authorized by IEEPA.

While our result comports with the plain language of IEEPA, we note that Global Relief's reading of the statute could completely undermine the statutory purposes of the act. If Global Relief's interpretation of IEEPA were correct, then any foreign person or entity could create a corporation under the laws of any state and then use that "domestic" corporation to direct and fund acts of terror against the United States. We disagree. The simple act of domestic incorporation is not sufficient to exempt an organization from IEEPA regulation if, as the statute says, a foreign national has "any interest" in the organization or its funds.

### iii) Does IEEPA's humanitarian exception apply in this case?

The second prong of Global Relief's statutory argument is that OFAC's blocking order was an *ultra vires* action because it directly violated IEEPA's humanitarian relief exception. This provision states:

> [t]he authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly . . . donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor . . . .

50 U.S.C. § 1702(b)(2). This language makes it clear that, notwithstanding the declaration of a national emergency, Congress intended that IEEPA would exempt humanitarian aid donations from executive regulation unless the President makes further findings that humanitarian aid

would seriously impair his ability to deal with the emergency or would endanger U.S. armed forces. *See Veterans Peace Convoy, Inc. v. Schultz*, 722 F. Supp. 1425, 1429 (S.D. Tex. 1988).

Nevertheless, Global Relief asserts that "the power to regulate humanitarian activities by U.S. persons is limited to issuing blocking orders prohibiting all U.S. persons from providing aid to specified foreign persons or in specified foreign locales and is not a power to single out a particular U.S. person as subversive and strip it of the right to provide humanitarian aid to anyone." (Global Relief Prelim. Injunction Brief at 12.) We disagree.

No doubt cognizant of the humanitarian relief exception included in section 1702(b)(2) of IEEPA, President Bush explicitly stated in his Executive Order that "the making of donations of the type specified in section [1702(b)(2)] by United States persons to persons determined to be subject to this order would seriously impair [the President's] ability to deal with the national emergency declared in this order, and would endanger Armed Forces. . . and [the President] hereby prohibit[s] such donations." Exec. Order 13224, § 4. This statement clearly was intended to trigger the presidential findings proviso of section 1702(b)(2) whereby Congress specifically authorized the President to block or stem the flow of humanitarian relief in cases of national emergency.

This Court must be guided by what we view as the intent of Congress in passing the humanitarian relief exception, and, in this regard, the language of the statute speaks for itself. *See United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524 (1981) (if statutory language is unambiguous, that language must be regarded as conclusive). The humanitarian relief exception applies explicitly to "articles, such a food, clothing, and medicine, intended to be used to relieve

human suffering." 50 U.S.C. § 1702(b)(2). This means that any charitable aid that Global Relief provides both domestically and abroad falls within the scope of the statute.

Once it has been shown that humanitarian aid is within the ambit of the statute, Congress has explicitly determined that the President can directly block its distribution as long as he determines that the donations "would seriously impair his ability to deal with any national emergency." *Id.* It is important to note that Congress did not include any sort of temporal or geographic limitation on the President's ability to block humanitarian aid. There is no statement that the President can only block the distribution of international aid or that he can only block aid to specific foreign persons in specified foreign locations. Instead, Congress enacted broad, sweeping language which authorized the President to block any and all humanitarian efforts by the targeted entity so long as he declares that the provision of such relief would jeopardize his ability to deal with a national emergency.

In this case, we have already noted that President Bush made the required declaration in his Executive Order that the making of charitable donations by the targeted entities would impair his power to deal with the national emergency following the September 11 attacks. OFAC then used the powers delegated to it by the Secretary of the Treasury to block the ability of Global Relief to dispense its humanitarian aid both domestically and internationally. Therefore, based on our review of the statute and the discussion above, we find that OFAC's actions in issuing the blocking order were not *ultra vires* because the defendants strictly complied with the unambiguous language of section 1702(b)(2) of IEEPA. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 636-37, 72 S.Ct. 863 (1952) (an action "executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the

widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.") (Jackson, J. concurring).

<blockquote>
iv)     Did the President legally delegate to OFAC the authority to block assets during the pendency of an investigation?
</blockquote>

In its final statutory argument in support of its motion for a preliminary injunction, Global Relief asserts that OFAC was never legally delegated the power to block assets "during the pendency of an investigation" pursuant to IEEPA. Specifically, Global Relief contends that the blocking order was *ultra vires* because President Bush only delegated to the defendants in section 1(c) of his Executive Order the power "to block" property of persons <u>determined</u> to be sponsoring terrorism. Global Relief further argues that, because the defendants have not <u>determined</u> that it acted for or was associated with a terrorist organization, the blocking order was outside the authority delegated to OFAC by the President and the Secretary of the Treasury. Additionally, Global Relief argues that President Bush "could not have delegated the power 'to block during the pendency of an investigation' in Executive Order 13224 even if he had expressed such an intent because President Bush did not have that power to delegate when he signed the Executive Order." (Global Relief Prelim. Injunction Brief at 15.) We will address each of these arguments in turn.

First, Global Relief argues that "[i]nstead of granting all his power, including the power to nullify, void, prevent, and prohibit any acquisition or transfer of property, President Bush only delegated to defendants the power "to block" property of persons **determined** to be sponsoring or associated with other blocked entities." (*Id.* at 14.) We must reject this argument because it

focuses only on one isolated section of the Executive Order without considering the order as a whole.

Global Relief is correct that section 1(c) of the Executive Order does limit the effect of the order's blocking provision to those entities determined by the Secretary of the Treasury (as well as the Secretary of State and the Attorney General) to be connected with foreign terrorists. Section 1(c) states that the property of "persons determined by the Secretary of the Treasury . . . to be owned or controlled by . . . persons to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order" is blocked. Exec. Order 13224, § 1(c). However, Global Relief seems to have assigned some special meaning to the word "determined." Apparently, Global Relief feels that the Secretary of the Treasury and OFAC have not "determined" that it is sponsoring or associated with foreign terrorists. This is a curious argument for Global Relief to make. Global Relief's complaint and numerous briefs paint a vivid picture of the damage it has allegedly suffered as a result of the defendants' "determination" that Global Relief was associated with funding foreign terrorists.

Nevertheless, even putting Section 1(c) of the Executive Order aside, Section 5 of the order authorizes the Secretary of the Treasury (and his designee) to "take such other actions than the complete blocking of property or interest in property as the President is authorized to take under IEEPA . . . if the Secretary of the Treasury . . . deems such other actions to be consistent with the national interests of the United States." Exec. Order 13224, § 5. Our reading of this section of the order informs us that a blocking of assets "during the pendency of an investigation" is contemplated as a permissible course of action because such a blocking order is expressly authorized by section 1702(a)(1)(B) of IEEPA, as amended by the USA Patriot Act. In other

24

words, OFAC's December 14 order blocking the assets of Global Relief during the pendency of its investigation certainly falls within the scope of section 5 of the Executive Order. Therefore, we conclude that OFAC's actions in blocking Global Relief's assets pending investigation were the result of a legal delegation of authority in the Executive Order from the President to OFAC.

This conclusion ties neatly into our analysis of Global Relief's second statutory delegation argument. In this section of its brief, Global Relief asserts that President Bush could not legally delegate to the Secretary of the Treasury and OFAC the power to block certain assets pending an investigation because, at the time he signed the Executive Order, IEEPA had not yet been amended by the USA Patriot Act to add this particular blocking power to the President's arsenal of economic weapons. In Global Relief's own words, "[t]o construe President Bush's invocation of IEEPA on September 23 to delegate powers that President Bush did not even have would violate fundamental canons of statutory construction." (Global Relief Prelim. Injunction Brief at 15.) For the following reasons, we reject this argument.

To address this contention properly, we must revisit the factual background of this case. Executive Order 13224, which delegated any and all presidential powers under IEEPA to the Secretary of the Treasury and his designee OFAC, was implemented on September 23, 2001. On October 26, 2001, President Bush signed the USA Patriot Act, which, as we have said before, added the ability to block "during the pendency of an investigation" to his other powers when a national emergency is declared under IEEPA. It is important to remember that the Executive Order delegated to the Secretary of the Treasury and his designee the authority "to employ all powers granted to the President by IEEPA." Exec. Order 13224, § 7. Finally, on December 14,

2001, OFAC issued and executed a blocking order freezing all of Global Relief's assets pending an investigation of its conduct.

Given this sequence of events, it is clear that on December 14, OFAC was empowered by IEEPA and the USA Patriot Act to issue the order blocking Global Relief's assets pending investigation. The USA Patriot Act amendments to IEEPA had been in effect for at least a month prior to the execution of the blocking order against Global Relief. Therefore, we cannot accept Global Relief's argument that President Bush did not legally delegate his blocking powers under IEEPA to the Secretary of the Treasury and OFAC.

We reach this conclusion despite Global Relief's argument that the powers of IEEPA are not self-executing and that neither the President nor OFAC were authorized to block during the pendency of an investigation unless he had first amended his Executive Order by publication in the Federal Register. Global Relief argues, in effect, that every time a statutory change or new enactment has the effect of altering the scope or the applicability of an Executive Order, the Executive Order must be republished to legally incorporate within it the change of powers caused by the new statute. As a matter of regulatory efficiency, this argument makes little sense. To avoid this problem, presidents draft their executive orders in such a way as to foresee the future enactment of statutes by Congress. In terms of Executive Order 13224, section 7 states that the Secretary of the Treasury is authorized to "employ *all powers* granted to the President by IEEPA." Such open-ended wording leaves little doubt that the President intended to delegate to his subordinates the fullest extent of his statutory powers, including new and/or different powers subsequently granted by Congress to the President. Accordingly, we conclude that the defendants' actions in implementing the December 14 blocking order were the result of a legal

delegation of the President's authority under IEEPA and the USA Patriot Act. Thus, the blocking order was not an *ultra vires* act.

### 3. Summary

In the first part of its motion for a preliminary injunction, Global Relief argued there was a likelihood that it would succeed on the merits of its claims concerning FISA and IEEPA. Specifically, Global Relief asserted that the search of its corporate headquarters and the home of its executive director violated FISA and that the order blocking Global Relief's assets pending an investigation was not authorized under IEEPA. As discussed in significant detail above, we have rejected these arguments. Rather, we hold that the search of the headquarters and the executive director's home complied with the statutory safeguards of FISA. With respect to IEEPA, we hold that IEEPA does not as a matter of law apply only to the foreign property interests of foreign nationals. Instead, the powers included in IEEPA can be directed toward purely domestic assets of an U.S. citizen as long as some foreign national has an interest in the domestic corporation. Furthermore, OFAC's December 14 blocking order did not violate IEEPA's humanitarian relief exception. Finally, we conclude that President Bush legally delegated his authority under IEEPA to block assets during the pendency of an investigation to the Secretary of the Treasury and his designee OFAC. Therefore, based on these holdings, we find that Global Relief has not established that there is a likelihood that it would succeed on the merits of its statutory claims.

**B.    Global Relief Has Not Shown That It Has A Reasonable Likelihood Of Success On the Merits Of Its Constitutional Arguments**

In its motion for preliminary injunction, Global Relief argues that the defendants' actions violated numerous provisions of the Constitution. We will analyze each of these constitutional claims to determine whether Global Relief is likely to succeed on the merits of its claims.

   1.    The Bill of Attainder Clause

Global Relief first argues that the defendants' actions in "designating it as a terrorist" and "seizing and forfeiting its assets" and "outlawing other U.S. persons from transacting business with it" violate the Bill of Attainder Clause, U.S. Const. art. 1, § 9, cl. 3.

A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841, 846-47, 104 S.Ct. 3348 (1984) (quoting *Nixon v. Adm'r of Gen. Services*, 433 U.S. 425, 468, 97 S.Ct. 2777 (1977)). *See also Dehainaut v. Pena*, 32 F.3d 1066, 1070 (7th Cir. 1994), *cert. denied*, 514 U.S. 1050 (1995). Global Relief argues that, in this case, Congress determined it to be worthy of punishment, designated it guilty and proceeded to impose punishment in violation of the Bill of Attainder Clause.

We find that Global Relief is not likely to succeed on this claim because there is no "law" involved and because the defendants' actions did not inflict "punishment."

   i)    Congress Took No Action Against Global Relief

In this case, there is no <u>law</u> that legislatively inflicted punishment on Global Relief. Contrary to Global Relief's assertions, <u>Congress</u> did not place Global Relief on any list of suspected terrorists or potential supporters of terrorism. Global Relief is complaining about the

28

actions of OFAC, an executive agency, and the issuance of its temporary blocking order. The actions of OFAC, however, did not <u>legislatively</u> determine guilt. *See Selective Service*, 468 U.S. at 846. "The bulk of authority suggests that the constitutional prohibition against bills of attainder applies to legislative acts, not to regulatory actions of administrative agencies." *Walmer v. United States Dep't of Defense*, 52 F.3d 851, 855 (10th Cir. 1995) (citations omitted). "No circuit court has yet held that the bill of attainder clause, U.S. Const. art I, § 9, cl. 3, applies to regulations promulgated by an executive agency." *Paradissiotis*, 171 F.3d at 988 (citing *Walmer*, 52 F.3d at 855); *Dehainaut*, 32 F.3d at 1070-71; *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas "Coopservir LTDA." v. Newcomb*, Civ. Action No. 98-0949, slip op. at 10 (D.D.C. Mar. 29, 1999) ("Coopservir"), *aff'd* 221 F. 3d 195 (2000). Therefore, Global Relief is not likely to prevail in proving a violation of the Bill of Attainder Clause because there was no action taken against it by Congress and no law that legislatively determined Global Relief's alleged guilt.

ii) <u>Defendants' Actions Do Not Constitute "Punishment"</u>

In addition, the defendants' actions do not inflict "punishment" upon Global Relief "without provision of the protections of a judicial trial." *See Nixon v. Administrator of General Services,* 433 U.S. 425, 468 (1977). Neither the identification of Global Relief as one to be investigated for possible support of terrorism nor the seizure and temporary blocking of Global Relief's assets is likely to constitute punishment under the Bill of Attainder Clause.

In determining whether legislation inflicts "punishment" such that it implicates the Bill of Attainder Clause, the Supreme Court has considered three factors: 1) whether the challenged statute falls within the historical meaning of legislative punishment; 2) whether the statute,

29

"viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes;" and 3) whether the legislative record "evinces a congressional intent to punish." *Selective Service,* 468 U.S. at 852.

In this case, we find that OFAC's identification of Global Relief as one to be investigated for possible support of terrorism and its temporary blocking of Global Relief's assets does not constitute "punishment" within the meaning of the Bill of Attainder Clause. Not all harm or inconvenience resulting from governmental authority constitutes "punishment." *See Nixon,* 433 U.S. at 472; *DeVeau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146 (1960). Moreover, the temporary blocking of Global Relief's assets does not inflict a type of punishment historically viewed as prohibited by the Bill of Attainder Clause, such as a death sentence, imprisonment, banishment, or a punitive confiscation of property. *Id.* Although Global Relief's assets are temporarily blocked during OFAC's investigation, such a blocking does not constitute a punitive confiscation of property because no forfeiture in favor of the government has occurred and because Global Relief has received OFAC licenses to continue some of its operations.

Second, defendants' actions seem motivated by a desire to protect the health and well-being of the nation by reducing the likelihood of future terrorist attacks against the United States and its interests rather than by a desire to punish Global Relief. Hence, these actions do not constitute punishment pursuant to the Bill of Attainder Clause, because that "will be found only where the statutory burden is . . . 'so disproportionately severe and so inappropriate to nonpunitive ends'. . . that a legislative desire to punish can be discerned." *640 Broadway Renaissance Co. v. Cuomo,* 740 F. Supp. 1023, 1035 (S.D.N.Y. 1990), *aff'd* 927 F. 2d 593 (2d Cir. 1991) (quoting *Nixon,* 433 U.S. at 474). Global Relief bears the burden of showing "that the

legislature's action constituted punishment and not merely the legitimate regulation of conduct." *Nixon*, 433 U.S. at 476 n.40. In this case, Global Relief is not likely to meet this burden. *Cf. Dehainaut*, 32 F.3d at 1071-72; *Coopservir*, slip op. at 11 ("[T]he Notice 'reasonably can be said to further nonpunitive legislative purposes,' namely protection of national interests. . . .") (citation omitted).

Third, in determining whether legislation constitutes "punishment," the Supreme Court has narrowly construed this to require "unmistakable evidence of punitive intent" in the legislative history before an enactment may be invalidated on this basis. *Selective Service*, 468 U.S. at 855 n. 15 (quoting *Fleming v. Nestor*, 363 U.S. 603, 619, 80 S.Ct. 1367 (1960)). Global Relief can point to nothing in the legislative history of IEEPA, the history of Executive Order 13224, or the history of the blocking notice that evinces any intent to punish it. *See Coopservir*, slip op. at 12. Moreover, at least one court has held that "[t]he mere publication of [a] name in the [OFAC] list did not evince an 'intent to punish.'" *Paradissiotis*, 171 F.3d at 989.

For all of these reasons, the temporary blocking order and designation of Global Relief as an entity to be investigated for possible support of terrorism do not amount to "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." Moreover, two courts have rejected nearly identical bill of attainder claims arising out of other OFAC blocking orders pursuant to sanctions programs under the IEEPA. *See Paradissiotis*, 171 F.3d at 989; *Coopservir*, slip op. at 10-12. Therefore, we find that Global Relief is not likely to succeed in proving a violation of the Bill of Attainder Clause.

2.    Ex Post Facto Clause

Global Relief next claims that the USA Patriot Act, which amended IEEPA, is an ex post

facto law.   The Ex Post Facto Clause prohibits four types of laws: 1) laws that denominate an

action as criminal even though the action was taken before the passing of the law and was

innocent when taken; 2)  laws that aggravate a crime or make it greater than it was when

committed; 3) laws that change the punishment, and inflict a greater punishment, than the law

applied to the crime when committed; and 4) laws that alter the legal rules of evidence and

receive less, or different, testimony than the law required at the time of the commission of the

offense in order to convict the offender. *Carmell v. Texas*, 529 U.S. 513, 521-22, 120 S.Ct. 1620

(2000).

In determining whether legislation violates the Ex Post Facto Clause, courts use a three-

pronged test.  In order to violate the Ex Post Facto Clause: 1) the legislation must be penal or

criminal in nature; 2) the legislation must be retrospective; and 3) the legislation must

"disadvantage the offender affected by it." *United States  v. Couch*, 28 F.3d 711, 713 (7th Cir.

1994), *cert. denied*, 513 U.S. 993 (1994) (citations omitted).

In this case, the USA Patriot Act's amendments to IEEPA do not satisfy the first two

prongs of the test.  First, the modifications to IEEPA are not penal or criminal in nature, and the

Ex Post Facto Clause only applies to criminal laws. *See Collins v. Youngblood*,  497 U.S. 37, 41,

110 S.Ct. 2715 (1990); *Flores-Leon v. INS*, 272 F.3d 433, 440 (7th Cir. 2001).  The USA Patriot

Act made six changes to IEEPA.  Only two changes are relevant to this case.  One provision now

explicitly permits the President and his designees to block assets of entities "during the pendency

of an investigation." Pub. L. No 107-56, § 106, 115 Stat.272, 277.  Another provision authorizes

the Executive Branch to submit an agency record containing classified information "ex parte and in camera" for judicial review. *Id.* at 278. Neither provision is penal or criminal in nature. *Cf. United States v. Arch Trading Co.*, 987 F.2d 1087, 1093-95 (4th Cir. 1993).

Moreover, the recent changes to IEEPA were intended to help address the national emergency concerning the terrorist attacks on September 11 and the threat of future attacks - they were not intended to punish Global Relief. Contrary to Global Relief's assertions, the defendants' temporary seizure and blocking of Global Relief's assets do not constitute a forfeiture or an unauthorized punishment. *Cf. Gilbert v. Peters*, 55 F.3d 237, 238 (7th Cir. 1995) ("Although 'criteria for determining whether or not legislation is punitive have yet to be fully developed,' one significant factor for consideration is the legislation's purpose.") (citation omitted). For all of these reasons, the USA Patriot Act's amendments to IEEPA are not penal or criminal in nature and do not satisfy the first prong of the test.

Second, even if the USA Patriot Act's amendments to IEEPA could be construed as penal or criminal in nature, the Ex Post Facto Clause still would not apply because the amendments are not retrospective. *See Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960 (1981); *United States v. Szarwark,* 168 F.3d 993, 998 (7th Cir. 1999). The USA Patriot Act was passed in October 2001, over a month before the FBI removed Global Relief's records and property and OFAC issued a blocking notice temporarily freezing Global Relief's assets. Therefore, the legislation is not retrospective.

Finally, contrary to Global Relief's claims, the USA Patriot Act is <u>not</u> "unquestionably a law 'that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.'"

*Carmell,* 529 U.S. at 530. The USA Patriot Act's amendments to IEEPA do not change the sufficiency of evidence needed to obtain a criminal conviction. The actions being contested here - the seizing of records and the temporary blocking of assets during an investigation - are not criminal penalties.

In sum, because the USA Patriot Act's changes to IEEPA are neither penal nor retrospective in nature, nor do they change the rules of evidence necessary to obtain a criminal conviction, Global Relief is not likely to succeed on its ex post facto claim.

### 3. Taking Without Just Compensation

The Takings Clause of the Fifth Amendment forbids the government from taking private property for public use without just compensation. Global Relief claims that defendants' seizure of its assets and the temporary blocking order effects an uncompensated taking. This argument is incorrect for two reasons.

First, a person claiming an uncompensated taking resulting from an action taken pursuant to IEEPA must typically bring a claim for monetary relief under the Tucker Act, 28 U.S.C. § 1491, in the Court of Federal Claims. *Dames & Moore,* 453 U.S. at 688-90. *See also* 28 U.S.C. § 1346(a)(2); *Paradissiotis,* 171 F.3d at 989 (noting that "the Court of Federal Claims has exclusive jurisdiction for all claims for monetary relief against the United States greater than $10,000"). Accordingly, this claim is filed in the wrong court.

In addition, even if this Court had jurisdiction, Global Relief's takings claim would fail. Takings claims have often been raised - and consistently rejected - in the IEEPA context. Many courts have recognized that a temporary blocking of assets does not constitute a taking because it is a temporary action and not a vesting of property in the United States. *See, e.g., Tran Gui Than*

34

*v. Regan*, 658 F.2d 1296, 1304 (9th Cir. 1981); *Miranda*, 766 F.2d at 5. As the *Tran Gui Than* court held, "[w]e recognize that blocking involves a deprivation of the enjoyment of a property interest. That deprivation is temporary, however, and is not equivalent to vesting." *Tran Gui Than*, 658 F.2d at 1304.

For all of these reasons, Global Relief is not likely to succeed in proving a violation of the Fifth Amendment's Takings Clause.

### 4. The Executive Order is Not Unconstitutionally Vague

Global Relief next argues that Executive Order 13224 is unconstitutionally vague because it neither defines "associated with" nor gives sufficient notice of the type of conduct which is prohibited. As stated earlier, the Executive Order allows OFAC to freeze an entity's assets if it is determined by the President, or those persons delegated by the President, that the person acted for, sponsored, or was otherwise associated with a person determined to be a terrorist.

We find that this argument lacks merit because this claim is not yet ripe for review. In this case, OFAC blocked Global Relief's assets pending investigation to determine if further blocking or designation should take place under one or more criteria of the Executive Order. There has not yet been any determination under the Executive Order as to whether designation or further blocking should take place. Thus, Global Relief's challenge is not ripe for review. *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431,1441 (9th Cir. 1996); *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 511 (9th Cir. 1991) ("Even in the case of a pre-enforcement challenge such as this, the exercise of jurisdiction without proper factual development is inappropriate."); *Western Mining Council v. Watt*, 643 F.2d 618, 627 (9th Cir. 1981) ("The mere possibility that [an official] may act in an arguably unconstitutional manner. . .

35

is insufficient to establish the 'real and substantial controversy' required to render a case justiciable under Article III").

Therefore, Global Relief cannot establish a likelihood of success on its claim that the Executive Order is unconstitutionally vague.

### 5. Due Process

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Global Relief argues that defendants are violating its right to due process by temporarily blocking Global Relief from its property and business without any judicial oversight.

#### i) Pre-Deprivation Procedures

The due process clause generally requires the government to afford notice and a meaningful opportunity to be heard before depriving a person of certain property interests. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 62, 114 S.Ct. 492 (1993). However, when exigent circumstances are present and the government demonstrates a "pressing need for prompt action," the Supreme Court has long struck the procedural due process balance so as to dispense with the requirement for a pre-deprivation hearing. *James Daniel Good*, 510 U.S. at 56; *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 679, 94 S.Ct. 2080 (1974). "It is by now well established that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances . . . [W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807 (1997) (citations and internal quotations omitted).

In *Calero-Toledo*, the Supreme Court upheld a statute that permitted seizure of assets

without pre-deprivation process because "[t]he considerations that justified postponement of

notice and hearing in [prior] cases are present here":

> First, seizure under the [applicable] statutes serves significant governmental
> purposes .... Second, preseizure notice and hearing might frustrate the interests
> served by the statutes, since the property seized ... will often be of a sort that could
> be removed to another jurisdiction, destroyed, or concealed, if advance warning of
> confiscation were given. And finally, . . . seizure is not initiated by self- interested
> private parties; rather, [government] officials determine whether seizure is
> appropriate under the provisions of the. . . statutes. In these circumstances, we
> hold that this case presents an 'extraordinary' situation in which postponement of
> notice and hearing until after seizure did not deny due process.

*Id.* at 679-80 (citing *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983 (1972)). *See also Federal*

*Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240-41, 108 S.Ct. 1780 (1988).

Due to the exigencies of national security and foreign policy considerations, the

Executive Branch historically has not provided pre-deprivation notice in sanctions programs

under IEEPA. The actions taken by the Executive Branch pursuant to these statutes are

procedurally and substantively different from other types of governmental conduct in that they

first require a declaration of war or national emergency arising, at least in substantial part,

outside the United States. *See* 50 U.S.C. §§1701-02, app. § 5(b). Because of the Executive's

need for speed in these matters, and the need to prevent the flight of assets and destruction of

records, the President and his designees cannot provide pre-deprivation notice under these

circumstances. *See Haig*, 453 U.S. at 307 ("no governmental interest is more important than the

security of the Nation"); *Palestine Information Office v. Shultz,* 853 F.2d 932, 942-43 (D.C. Cir.

1988).

37

Pre-deprivation notice would, in fact, be antithetical to the objectives of these sanctions programs, and, as a result, it is OFAC policy when initiating a blocking pursuant to IEEPA not to provide pre-blocking notice. (Newcomb Decl. ¶ 11-12.) Summary process in these circumstances simply maintains the status quo, protects against transfer or dissipation of assets subject to the blocking order, and furthers the compelling government interest in promoting its declared national security and foreign policy goals.

In fact, courts repeatedly have held that orders issued without pre-blocking notice in these types of cases do not violate the Due Process Clause. *See, e.g., Milena*, 995 F.2d at 624 ("OFAC had to act quickly following the issuance of the Executive Orders; delay would have allowed the assets to leave the United States, thereby thwarting the purpose of the Orders."); *IPT Co. v. United States Dep't of Treasury*, 1994 WL 613371, at *6 (S.D.N.Y. Nov. 4, 1994) (holding that pre-deprivation notice and hearing was not required in connection with an OFAC blocking order).

For all of the foregoing reasons, we find that Global Relief is not likely to succeed in proving its claim that defendants violated Global Relief's due process rights by failing to provide notice and a meaningful opportunity to be heard prior to temporarily blocking Global Relief's assets.

ii)     Post-Deprivation Procedures

Global Relief also contends that defendants' post-blocking procedures violate the Due Process Clause. However, we find that Global Relief is not likely to succeed on this claim because it chose not to utilize many of the available administrative remedies and, when it did opt to use the OFAC process for obtaining licenses, it did not act promptly.

38

OFAC provided Global Relief with a variety of post-blocking options which satisfied its due process obligations. First, OFAC delivered a notice to Global Relief on the day of the temporary blocking that informed it that OFAC believed that Global Relief "may be engaged in activities that violate IEEPA." The notice delineated Global Relief's right to present evidence and/or argument to OFAC if it believed the blocking was made in error, including the right to make submissions by facsimile "to expedite" OFAC's response. The notice also informed Global Relief of OFAC's "licensing authority to help ameliorate the effects of the blocking" of Global Relief's funds and accounts. Through the licensing authority, Global Relief could obtain funds to pay salaries, rent, utility payments, and attorneys fees. The notice also referred Global Relief to relevant agency regulations and provided it with an agency contact and phone number in case any questions arose.

Despite OFAC's notification to Global Relief of its right to submit evidence and argument if it believed the blocking was in error, Global Relief has never availed itself of this opportunity in the almost six months since the temporary blocking order was issued. Global Relief speculates that such an administrative challenge would have been "window dressing," because the "very person who is responsible for prosecuting" Global Relief (the Director of OFAC) would have received the evidence.

Contrary to Global Relief's assertions, the director of OFAC is an appropriate person to consider administrative appeals. *Withrow v. Larkin*, 421 U.S. 35, 56, 95 S.Ct. 1456 (1975). In *Larkin*, the Supreme Court held that it is:

> very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This

> mode of procedure does not violate the Administrative Procedure Act, and it does
> not violate due process of law.

*Id.* at 56. In fact, in other cases, the OFAC director has revoked blocking orders based upon

new information provided by a designated party. That Global Relief opted to ignore its

administrative due process rights and choose instead to file this case cannot be considered a

constitutional violation on the part of defendants.

Second, as part of its due process obligations, the agency also provided an administrative

mechanism to Global Relief to allow it to request licenses for payment of certain expenses.

During the past four months, OFAC has issued licenses to Global Relief to allow for payment of

legal fees, establishment of a legal defense fund, payment of obligations outstanding as of the

date of the temporary blocking, and payment of certain continuing expenses. These licenses have

allowed Global Relief to maintain some of its operations during the pendency of the

investigation. Although Global Relief complains that OFAC is causing it great hardship, it

should be noted that Global Relief waited over a month from the time the agency asked it to

submit a proposed operating budget until it did so.

Finally, Global Relief claims that OFAC has denied it due process by not giving it access

to its own documents seized on December 14, 2001 and by not providing it with classified

documents used to support the temporary blocking action. First, the issue of Global Relief being

denied access to its own documents has been addressed by the Court and defendants have been

returning documents to Global Relief on an on-going basis.

Moreover, we do not believe that defendants have created a due process violation by

denying Global Relief access to classified documents. When, as here, Congress and the

President have determined a need for the secrecy of government information, courts have rejected challenges to the *ex parte* use of a classified record. *See, e.g., National Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196 (D.C. Cir. 2001) ("The Secretary may base his findings on classified material, to which the organization has no access at any point during or after the proceeding to designate it as a terrorist.").

For these reasons, we find that Global Relief will not likely succeed in proving a due process violation regarding defendants' post-blocking procedures.

### 6. First Amendment

Global Relief next argues that defendants have violated the First Amendment. The First Amendment provides that "Congress shall make no law. . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble. . . ." Global Relief raises two First Amendment arguments to challenge the defendants' actions. First, Global Relief argues that the Executive Order is unconstitutionally overbroad. Second, Global Relief argues that, as applied to United States persons, the Executive Order violates the First Amendment. We find that Global Relief is unlikely to prevail on these arguments.

First, the Executive Order empowers OFAC to freeze an entity's assets if it is determined that the person acted for, sponsored, or was otherwise associated with a person determined to be a terrorist. Although its argument is vague, Global Relief appears to argue that the Executive Order violates the First Amendment because it is overbroad in that it does not define the term "associated with."

However, because the Executive Order neither "<u>directly</u> regulates speech or expression arguably protected by the First Amendment" nor grants "discretion to a delegatee to determine

whether particular items of expression may be prohibited on the basis of their content," the question of overbreadth does not arise. *Veterans & Reservists for Peace in Vietnam v. Regional Comm'r of Customs, Region II,* 459 F.2d 676, 681 (3d Cir. 1972). To prevent additional terrorist attacks, the Executive Order governs financial arrangements and other types of support; its effects on speech, if any, are incidental. Consequently, it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746 (1989).

Moreover, "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien,* 391 U.S. 367, 376-77, 88 S.Ct. 1673 (1968). The *O'Brien* court held that:

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 376-77.

In this case, the Executive Order clearly meets these requirements. First, the President clearly had the power to issue the Executive Order. Second, the Executive Order promotes an important and substantial government interest - that of preventing terrorist attacks. Third, the government's action is unrelated to the suppression of free expression; it prohibits the provision of financial and other support to terrorists. Fourth, the incidental restrictions on First Amendment freedoms are no greater than necessary. *See Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1135-36 (9th Cir. 2000); *Palestine Info. Office,* 853 F.2d at 939-40; *cf. Walsh v.*

*Brady*, 927 F.2d 1229, 1234-35 (D.C. Cir. 1991). Therefore, it is unlikely that the Executive Order, as applied to United States citizens, violates the First Amendment.

For all of these reasons, we find that Global Relief is unlikely to prevail in proving that defendants' actions violate the First Amendment.

### 7.  Eighth Amendment

Global Relief next argues that the government has instituted a civil forfeiture in violation of the Eighth Amendment's prohibition on excessive fines. Before a court can conclude that a fine is excessive under the Eighth Amendment, it must first determine that a fine was in fact paid to the government. The constitutional prohibition concerning excessive fines "was intended to limit only those fines directly imposed by, and payable to, the government." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 268, 109 S.Ct. 2909 (1989).

In this case, Global Relief has failed to show the existence of any such fine. Global Relief has not been required to make any sort of payment in cash, or in kind, to the government. Although Global Relief's funds are held in temporarily blocked accounts, the government has not collected or received any of these funds. Despite Global Relief's assertions, OFAC's blocking notice does not constitute a forfeiture of Plaintiff's property.

For these reasons, we find that it is unlikely that Global Relief will succeed in proving that a civil forfeiture has occurred.

### 8.  Separation Of Powers

Global Relief next argues that IEEPA violates the separation of powers. Specifically, Global Relief argues that Congress cannot delegate carte blanche to the President. Moreover, Global Relief claims that "OFAC's approach combines lawmaker, investigator, prosecutor, fact

43

finder and jailer or executioner into a single office, indeed a single person; this is not a permissible combination of functions, even where administrative process is sufficient."

Global Relief is not likely to succeed on these claims. First, IEEPA grants the President certain emergency powers. The President has inherent Article II powers as commander in chief. The President has delegated his statutory power under IEEPA to OFAC. Pursuant to this authority, OFAC is granted certain powers to investigate, issue blocking orders, and provide certain remedies. Many agencies operate under similar circumstances. Therefore, the provisions of IEEPA and its delegation of authority to OFAC is not likely to violate the separation of powers.

### 9. Fourth Amendment

Global Relief next argues that defendants unconstitutionally searched its offices and seized its property in violation of the Fourth Amendment. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

We reject Global Relief's argument because FISA's safeguards provide sufficient protection for the rights guaranteed by the Fourth Amendment in the context of foreign intelligence activities. We agree with the many courts which have held that searches conducted pursuant to FISA do not violate the protections afforded by the Fourth Amendment. *See, e.g., United States v. Pelton,* 835 F.2d 1067, 1075 (4th Cir. 1987); *United States v. Cavanagh,* 807 F.2d 787, 790-92 (9th Cir. 1987); *United States v. Duggan,* 743 F.2d 59, 73 (2d Cir. 1984).

For these reasons it is unlikely that Global Relief will succeed in proving a violation of the Fourth Amendment.

### 10. Fifth And Sixth Amendments

Finally, Global Relief claims that it has been deprived of its rights under the Fifth and Sixth Amendments because it is being required to answer for a capital, or otherwise infamous crime, without presentment or indictment of a Grand Jury. Additionally, Global Relief argues that it has been deprived of the right to a speedy and public trial, an impartial jury, notice of the charges, an opportunity to confront witnesses and a compulsory process for obtaining witnesses.

Global Relief's conclusory assertions, however, rely on a false predicate – that Global Relief is facing criminal sanctions. In this case, Global Relief is not being "held to answer for a capital, or otherwise infamous crime." U.S. Const. amend. V. It also does not currently face a "criminal prosecution[]." U.S. Const. amend. VI. Consequently, the protections afforded by these amendments do not apply to Global Relief.

For these reasons, it is unlikely that Global Relief will succeed in proving a violation of the Fifth and Sixth Amendments.

### 11. *Ex Parte, In Camera* Submission

Finally, Global Relief also argues that the defendants' submission of *ex parte, in camera* documents violates Global Relief's constitutional rights. While it is unclear exactly which provisions of the Constitution Global Relief claims that the *ex parte, in camera* submission violates, Global Relief appears to argue that its right to confront witnesses and its due process rights have been violated by this submission.

The Confrontation Clause of the Sixth Amendment guarantees a defendant in a criminal prosecution the right to confront the witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105 (1974). However, as we have previously stated, the Sixth Amendment is inapplicable because Global Relief is not facing criminal sanctions and is not being charged in a criminal prosecution. Consequently, the protections afforded by the Confrontation Clause of the Sixth Amendment do not apply in this case.

Moreover, we do not believe that the *ex parte, in camera* submission violates Global Relief's due process rights. *Ex parte, in camera* proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the root requirements of due process – notice setting forth the alleged misconduct and an opportunity for a hearing. *See Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963 (1974). Review of *ex parte, in camera* submissions can only be justified by compelling state interests. *See United States v. Bell,* 464 F.2d 667 (2d Cir.), *cert. denied*, 409 U.S. 991 (1972). Thus, the nature of the government's interest must be balanced against the private party's interest to determine if a due process violation has occurred.

In this case, the defendants have demonstrated that it would harm the national security of the United States to disclose, while the government's investigation is pending, the materials submitted *ex parte and in camera*. Moreover, the defendants disclosed as much of the material as it could divulge without compromising its investigation and the national security by publicly filing four binders of exhibits on March 27, 2002. Although Global Relief does have a substantial interest in being able to study and respond to the evidence against it, we find that the defendants have demonstrated a compelling state interest in national security which outweighs

46

W 9

Global Relief's interest in this case. This is especially true because this case involves a freeze of funds and examination of seized potential evidence to aid an investigation. This case is not a criminal prosecution nor is it a permanent forfeiture of assets. Thus, we find that it is unlikely that Global Relief will succeed on the merits of its due process claim regarding the defendants' use of *ex parte, in camera* documents.

       12.   <u>Summary</u>

In the second part of its motion for a preliminary injunction, Global Relief argues that there is a likelihood that it would succeed in proving that the defendants violated the Constitution. Specifically, Global Relief argues that defendants have violated the Bill of Attainder Clause, the Ex Post Facto Clause, the Fifth Amendment's Takings Clause, the Due Process Clause, the First, Fourth, Fifth, Sixth and Eighth Amendments to the Constitution. In addition, Global Relief argues that Executive Order 13224 is unconstitutionally vague and that IEEPA violates the separation of powers.

As discussed in significant detail above, we find that these arguments are not likely to succeed on their merits. Therefore, we find that Global Relief is not likely to succeed in proving a violation of its constitutional rights. Coupled with its failure to demonstrate that it is likely to succeed on its statutory claims, Global Relief has failed to satisfy the likelihood of success threshold factor for preliminary injunctive relief.

Accordingly, "[i]f a plaintiff fails to meet just one of the prerequisites for a preliminary injunction, the injunction must be denied." *Cox v. City of Chicago*, 868 F.2d 217, 223 (7th Cir. 1989) (citing *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)). In this case, Global Relief has not proven a reasonable likelihood of success on the merits of its

statutory and constitutional claims. Because Global Relief is unable to demonstrate a likelihood of success on the merits, it is not necessary to examine the other elements for preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, we deny the motion of Global Relief Foundation, Inc. for injunctive relief.

_____
Wayne R. Andersen
United States District Judge

Dated: _June 11, 2002_